May it please the court. I am representing Ms. Dowling as the appellant in this case. It's a social security disability case. Procedurally, just very briefly, Ms. Dowling had been approved in a prior application and had been found disabled as of April 15th of 2009. This case involves a prior finding of disability and she was found to be not disabled at the initial levels up through the hearing process. And of course, a decision was issued in this case in 2016. Again, finding that her condition had improved and therefore she was no longer disabled as of March 31st of 2013. She was found disabled for four years, is that correct? That's correct. Approximately four years. Yes, your honor. Thank you. Basically, in my brief, I point out a few things. Issues that are probably, you know, the general issues are pretty familiar with the court probably in terms of these type cases. They're issues that come up frequently. First of all, the consideration of the treating opinion. Of course, there have been changes in those federal regulations in the last few years, but of course, the prior regulations would apply in this case. And, you know, the one thing that we that Ms. Dowling would have a very limited ability to sit. That's in the transcript in a basically disability questionnaire form. And Dr. Gross indicated that Ms. Dowling's ability to sit would be less than two hours a day. A big part of the problem here in terms of Ms. Dowling's condition is that as a result of her ulcerative colitis. What was Dr. Gross's medical opinion? You mean generally? Well, I know Dr. Gross had an opinion that appellate was, quote, not able to work, but that's not a medical opinion, is it, for purposes of this case? Oh, no, your honor. Yeah. Dr. Gross did provide a general statement that she was disabled, but Dr. Gross also provided a very specific assessment of Ms. Dowling's limitations that are in the transcript at page 773 through 775. Who said she had colitis or Croh's disease? I'd like to know that. Well, that was basically the original finding of her disability. I can't honestly, from memory, tell you the original sort of doctor who made the finding on that. You called it colitis and you just said a few minutes ago that she had ulcerative colitis. That's a serious ailment. Now, the government acknowledges that she had colitis or Croh's and basically tell us that that doesn't make any difference, but there is a big difference, or can be. Right. My understanding is Croh's disease is more serious than ulcerative colitis. Yes, your honor. The judge in the hearing decision did find, if you look at page 31 of the joint So, I don't think there's any contention or I don't think there's any dispute among the parties that those were both severe impairments. Is that in 2009 or 2013 or when? That was as of, no, the judge, if you look in the hearing decision, made findings. I'm not looking at the hearing decision. I'm asking you. I want to know when she was determined, when it was determined she had ulcerative colitis, when it was determined she had Croh's disease. Well, your honor, that was the original finding that led to the disability, but in the hearing decision, that's. Is that in 2009 then? Yes, your honor. 2009. Yes. If he has ulcerative colitis, she says ulcerative colitis or Croh's disease and Crohn's disease for 11 years. You don't get well, if you have Croh's disease or ulcerative colitis, you don't get well. You haven't. Yes, your honor. My understanding, now maybe I'm wrong. Well, I'm going to be honest. I'm sorry. I apologize. I did not mean to interrupt. I understand the point you're making. All I can tell you is in terms of, I'm certainly not a medical expert, so I can't speak in a lot of detail about, I know generally from handling these cases that both of these conditions. But you're more familiar with this record than we are, I think. You should be. Right. Well, I can tell you that the judge, the relevant legal issue is that the judge did find that she continued to have those conditions continuing to exist through the period of under review here. He did find that there was medical improvement and that she was doing better with these conditions. He did not specifically address what you're saying about with Crohn's disease and how that improvement specifically could occur. He did note in the records that symptoms were doing better. Well, there are medications for them that put some of them in remission. But it's my understanding they don't heal. They don't go away. Right. And part of the problem here is, and it's really reflected in the record, is that these are waxing and waning type conditions. There certainly is evidence that there was significant improvement prior to this judge finding that medical improvement did occur. But if I could sort of get to the crux of my argument, Dr. Gross, the treating physician, did find that there would be significant sitting limitations. And part of that, you know, and it is true that Dr. Gross sort of listed some conditions on the form. But my argument is you have to combine the treatment notes from Dr. Gross, which specifically cites the problems that Ms. Dowling was having with sitting due to her was having problems and pain with sitting as a result of that condition. And are those conditions side effects of the colitis Crohn's disease? That's my understanding, Your Honor. Yes, the sinus can be a result of the problems from that. That's absolutely correct. That's my understanding anyway. That's what the medical people think too, right? Right. Not this lawyer. Right. And I would like to point out, I think, on this point, if you look at the appellee's brief, it's sort of the appellee describes the improvement leading to the cessation of disability and then suggests that this whole thing with the fissure, the sinus, you know, this open basically area there that was causing a lot of problems, developed sometime after that. But if you look at the actual medical record, it's clear that the medical records, to the best I could determine, don't show exactly when this problem started. But it's clear that it was going on at least approximately around the time that the disability benefits were cut off. And specifically at page 501 of the transcript, when she goes to Dr. Gross, Dr. Gross notes that she continues to have the fissure and describes what she's trying to do to maintain it and take care of that. And that's a record from May 9th, which was, you know, less than just a little bit over a month after the disability ceased. But I did want to just, you know, so one thing, there's a couple of key points here that I want the court to consider. One is that if you look at the hearing decision, there's no discussion whatsoever of the obesity. And there is clear evidence that Ms. Dowling, unfortunately, was very obese. You know, the records document a number of times her BMI. Examples would be page 728 and 729 of the transcript that provide a chart showing at different dates what her BMI was. It tells me what BMI means. Tell me what BMI means. I'm sorry. Yes, your honor, the body mass index. And that's, that's, there you go. I think I know more about Crohn's disease than I do about body mass index, but go ahead. Okay. Well, BMI is basically a statistic to, to tell you, right. Understand now. Okay. All right. So, so her BMI, which is, is that I'm showing the, basically the obesity, ranged from 38 through 41 to 42 in the records, which is significantly obese. That's between class two and class three obesity. And so the, the doctor, her doctor actually specifically found that, or noted that trying to do a surgery to repair her, her, her fistula would, would be very much complicated by the obesity. And so it's clear that the obesity was a significant issue in this case. And I think logically though, though the commissioner correctly, you know, notes, and it is true, I would concede that Ms. Dowling isn't complaining about the obesity specifically to social security as a reason she's disabled. I think the record pretty clearly shows that it was a complicating factor here. And, you know, she talks about, she talks to her doctor about her problem with sitting and pain with sitting. And, and you know, it, I think it's just reasonable and logical to conclude that the obesity would be aggravating that given the extent of it. The judge. And which, which factor does that go to that the ALJ didn't consider? He doesn't, he doesn't even, he doesn't consider it at all. He doesn't make a finding as to whether and all right. So the ALJ was to engage in a function by function analysis, which, which particular function does not considering their obesity go to? Your honor, I would argue that that would certainly go to the sitting issue. And the, the, the judge notes, he specifically notes, and I find this again, very important. If you look at the one analysis in the hearing decision, this is page 33 of the joint transcript, a joint appendix, the, the judge notes that she alleges Ms. Dowling alleges problems with sitting due to her fistula. He specifically notes that in the decision. And then he states immediately thereafter, even though the claimant has medically determinable parents impairments that could reasonably cause some of her reported symptoms, the, the objective evidence does not support the so he concedes that the symptoms she alleges, which includes the problem sitting are documented and supported, but he just finds that they're not as severe as she suggests. But he, he, he included no restriction on sitting in the hearing decision. And she's limited only to a range of sedentary work, which of course would generally be primarily sitting. And therefore, you know, I would also just, I'm running out of time. I did want to note too, the only other exam or opinion that provides specific restrictions in the file from somebody who's actually evaluated the claimant, you know, um, hands-on evaluation was the consultant exam, but Dr. Hare, who also limited Dowling to four hours sitting total. And I'll stop right there. Judge Thacker, Judge Floyd, you have any further questions? Mr. Mays? No, I don't. Let's hear from the government. Thank you, your honors. Good morning and may it please the court. I'm Brittany Gelati appearing on behalf of the commissioner of social security. And I'll start with some of the backgrounds that your honors were asking about, which is that as we know, Ms. Dowling was previously awarded benefits at age 30, and that was due to a flare in her Crohn's disease that she had, and it was caused by sepsis. And so the ALJ, who was reviewing her case at that time, he understood that Dowling's condition was disabling following the, her contraction of sepsis, but the ALJ expected that her condition would improve with medication. And so when the agency did a continuing disability review in 2013 to see whether there was medical improvement as a previous ALJ had anticipated, there had been. And so the treatment notes from Dowling's gastroenterologist at that time showed that her disease was quiescent and it had gone into excellent clinical remission. And so your honors are correct that Crohn's disease is a lifelong condition, but Ms. Dowling in the record shows, and as the ALJ noted, her disease was doing well on her medication. And so her benefits were ended. But then Ms. Dowling, she had an unrelated surgery later, 2013 or 2014, where she took some pain medication and that caused constipation. And so as a result of constipation, she developed this new issue, which was a perianal fistula. And those are all terms that are used in the record that pertain to this same wound that's at the top of her buttocks. And so- And those conditions are typical of individuals who have Crohn's disease. Sure, sure. And so the ALJ did a very thorough job here. He understood this condition, he understood the full record, and he explained that this is- Wait, but he didn't really do a very thorough job with regard to Dr. Gross' opinion. Did he consider all six of the 404 factors? Yes, your honor, he did. Okay, so where- Well, specifically with regard to sitting, the ALJ discussed sitting very thoroughly. And he understood and he discussed on page 14 of the joint appendix that Dowling- or on page 12, I believe, that Dowling did report some problems when she sat for a long time. But the ALJ also knew that at the time Dr. Gross rendered her opinion, her treatment notes, for instance, on transcript page 912 showed that that sinus was healing well and that her Crohn's disease was controlled. And the ALJ also talked on joint appendix page 14 about treatment notes from gastroenterologist Dr. Morales. They said the same thing, that Dowling's Crohn's disease was an excellent remission and that her sinus was almost completely healed with medication. And the ALJ also explained that Dr. Gross' opinion here conflicted with the generally normal examination findings of consultative examiner Dr. Perkins. Can you stop talking for a second? I have a question. Yes, your honor. And I don't think you answered it in the first place. Where did the ALJ discuss the length of examination in connection with Dr. Gross? Let's start there. On pages 14 and 15 of the joint appendix runners, the ALJ gave a detailed discussion of Dowling's colitis, the fact that it was in clinical remission, her benefits were ended, and then he discussed her treatment notes. And I will add that Dr. Gross is a family physician, so she was of Dowling's Crohn's disease and also aware of this sinus, but Dr. Morales was the gastroenterologist who was treated. Right. But I'm asking about Dr. Gross. And also, where in the record did the ALJ discuss factor number two, the nature and extent of the treatment? Sure. So, the ALJ discussed on page 13 that Dr. Gross was a treating family practitioner. She was the claimant's treating family practitioner. And he discussed that she treated her for all different family type things. So, Dr. Gross was generally aware of claimant's impairments, mental, physical, whatever it was. And the ALJ's discussions on pages 13, 14, and into 15 thoroughly discussed the full picture here, the fact that Dowling had Crohn's disease, that she had remission, that she did for a period of time go off her Remicade medication, and that she was reporting some symptoms again. But the ALJ understood that that was a period of time when she had gone off the medicine. So, again, he looked here at the- I have another question. If we disagree with you and find that the ALJ was required to, but did not consider each of those factors, do we need to reverse and remand on that basis? What is your argument on that? So, you're saying if Your Honor is finding that the ALJ did not consider those factors, well, yes, that would be a finding of fact for the ALJ. But again, Your Honor, I think- And so then we would have to- If we disagree with you, I'm not saying necessarily that I do, but if we do, then you can see that we would need to reverse and remand on that basis because it's a factual matter. Well, I don't think- So, I guess as opposed to an award of benefits, is that what you're asking? Because my understanding are the court could affirm and find that the ALJ did consider Dr. Gross's findings and opinion. Or if the court believes that the ALJ did not, then it would be to remand the ALJ for further consideration of Dr. Gross's findings. But again, I'm not sure what the court thinks the ALJ should have further considered here. He looked at Dr. Gross's findings in detail, and he had a very clear picture of Ms. Dowling. And he also knew that she was working. Ms. Dowling was working 12-hour shifts once a week as a home health aide, which is a medium exertional job. And that contemplates sitting six hours a day, standing six hours a day, or walking six hours a day, in an eight-hour day. And here, she was doing this for 12 hours a day, and she didn't allege that she had problems sitting- But didn't the ALJ only mention her inability to sit one time? No, Your Honor. In the ALJ opinion? The ALJ looked at, or he discussed that she reported some issues sitting for a long time, but he also looked at her activities, for instance. And he talked about on page 18 that she preferred to grocery shop while sitting in a cart, that she was working, as I said, 12-hour shifts as a home health aide, which is medium work and contemplates sitting for six hours in an eight-hour day. And the ALJ looked at the treatment notes, which is very important here and can't be overstated, because the treatment notes- How often did she do that 12-hour shift? She did it once per week, Your Honor, and she testified that she didn't work more because the old lady that she was helping didn't request her to come more than that. And she would sometimes pick up additional shifts, about one to two times per month when requested. And she said that the reason that she maybe didn't think she could work full-time was because it was night shifts, and she might get tired. But it had nothing to do with problems sitting, needing to use a restroom. There was nothing in the record where Ms. Dowling was saying she couldn't perform this job because of her Crohn's disease, and I think that's extremely important. And I will- Ms. Gigliotti, this is Judge Floyd. Do you dispute that the ALJ did not conduct a function-by-function analysis of Dowling's limitations? Yes, I strongly dispute that, Your Honor. I believe that he did. Well, how about the conflicting evidence about Dowling's ability to sit for long periods and use the restroom? Sure. So the ALJ, he talked about that, Your Honor, and it's important here. So it's an ALJ's duty to look at all of the evidence in the record, including the conflicting evidence, and then to weigh that evidence. And so we look at this from the substantial evidence standpoint, and it's not a question of would we have made this same decision or how would we have weighed the evidence? So under the law, we look to see did the ALJ point to substantial evidence? And so he did here, Your Honor. He discussed Dowling's ability to sit, and he understood her complaints of trouble sitting for long periods, but he explains that he didn't think that Dowling was more limited than his residual functional capacity finding. And he pointed to examination findings showing that her sinus was healing when she was on the proper medication. He pointed to the fact that Dowling reported that she preferred to sit when she did different chores when she went grocery shopping. He looked at Dr. Hare's report, which is important here. Dr. Hare did a full exam. She noted that Dowling had Crohn's disease, that it was on the proper medication, but nothing about the sinus came up in that examination. Dowling didn't say that she had any trouble sitting when Dr. Hayes was examining her. So I think that's very important. The ALJ talked about that on page 15. The ALJ talked on page 18 that Dowling's physician in June of 2015 said, quote, her conditions were not activity limiting. That was on page 894. So the ALJ did his duty here. He understood what Dowling's complaints were, and he weighed that against all of the evidence in the record, and he pointed to the substantial evidence to support his claim. The Supreme Court in BSTEC noted is only more than a mere scintilla of evidence, and it's enough that a reasonable mind might find that there's enough to support. And here, there is absolutely enough evidence to meet that substantial evidence. And even if plaintiff can also, or Dowling, I should say, can also point to other evidence, that doesn't negate the substantial evidence that the ALJ did rely on here. Now, I'd like to discuss my colleague's claims about obesity, Your Honor. And it's important that Dowling never alleged that obesity was disabling, and neither did Dr. Gross or any other physician. She didn't identify it as an impairment in her positions. And on page 114 of the joint appendix, the magistrate judge noted that Dowling listed 11 different impairments in her pre-hearing brief, but not in obesity. And so Dowling said, as the ALJ considered, that it hurt when she sat for a long time, but she didn't say that obesity impeded her. And even if the ALJ could have said more on obesity, any error is harmless here, given that the ALJ addressed Dowling's ability to sit, and he addressed her sinus. So I think that's very important. And also with regard to surgery, which my colleague brings up, we think that this argument is a red herring, because the ALJ specifically considered on page 17 that her gastroenterologist, Dr. Morali, thought that Dowling's sinus could require surgery, but the ALJ noted that Dr. Morali had a remicade first. And as the ALJ's discussion makes clear on pages 14 and 15, surgery wasn't needed because the remicade was effective in healing the sinus. And after just a few treatments, Dowling's sinus was almost completely healed, which we can see on transcript page 577. And again, to the extent that she had further issues with that sinus, the ALJ explained on pages 15 and 16 that this was during a period when Dowling stopped taking her medication because the insurance stopped covering it. But once she went back on her medication, she began healing again. So, Your Honors, this ALJ, he had the full picture here. He understood Dowling's complaints. He weighed all of the evidence, and he rendered a finding that is true. No, I don't. Thank you, Ms. Gigliotti. I don't believe we do. Mr. Mays has got a couple minutes saved back. Mr. Mays? Thank you, Your Honor. I do need to address several things that were raised there that I to consider. First of all, regarding the obesity and the failure of Ms. Dowling to specifically raise that, the administrative judge is required to consider evidence of impairments regardless of whether the claimant is wise enough to bring those things up or raise them. She did have a non-attorney representative at the hearing. Ideally, the obesity would have been specifically brought up. However, if you look at Social Security Ruling 02-1P, which was the ruling that was in effect at the time that this case was considered relating to obesity, it specifically talks about if there's a high BMI, again, body mass index that's in the 30s, that that would be something that would sort of maybe require or that the administrative judge should contact a doctor to see the impact of the obesity. So the ruling does note that the judge should be looking at those issues and the evidence and address that. I wanted to specifically quickly address the work issue. I think it's to my client's benefit or it's admirable that she's done what she can to going once a week to an elderly woman's house to help her with medications and some light meals and things. She has access to a bathroom. I did want to also mention related to that, there's plenty of evidence. The judge concedes in the hearing decision that the problems with incontinence continued, but he dismissed it as a not severe problem because she said she wore pads. But she's still going to have to have access to a bathroom. You can't work throughout the day without changing those pads periodically. And again, that was not factored, there was not that function by function that's required by the Fourth Circuit. Thank you, Mr. Mays. Thank you, John. If we could do so, we'd leave the bench and shake hands with the lawyers in South Carolina and tell you you did a fine job. But we can't do that today. You say something, Mr. Mays? I'm sorry, Your Honor. I just said I really appreciate that. We appreciate your work. We appreciate your work, Ms. Griotti. Good to have you here. But we'll take your case under advisement and adjourn court for the day. Thank you. Y'all have a good day. Thank you, Your Honors. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: Robert B. King, Henry F. Floyd, Stephanie D. Thacker